LOVERING (MATTOCKS v.). See Case No. 9,299.

LOVETT v. BISPHAM. See Case No. 8,985.

---

## Case No. 8,555.

### The LOVETT PEACOCK.

[1 Lowell, 143.] [1]

District Court, D. Massachusetts. March, 1867.

SALVAGE—DERELICT—FINAL ABANDONMENT — OCCUPATION BY SALVORS—COMPENSATION.

1. A bark fell in with a schooner three hundred miles from shore in distress. The bark sent provisions, which were returned; the crew of the schooner abandoned her and went on board the bark, which proceeded on her voyage for three hours, when the captain finding the weather more favorable returned to the schooner. The captain of the schooner not being able to induce his men to return to their vessel, the second mate and four men of the bark went with provisions and sails and brought the schooner to port. *Held*, not a case of derelict, as the final abandonment by the owners and the occupancy by the salvors were contemporaneous acts, and the one would probably never have happened unless in a situation where the other was possible, as the boat of the schooner could not take off all her crew.
[Cited in The Cleone. 6 Fed. 525.]

2. The actual salvors succeeded in bringing in the schooner and cargo, valued at $90,000, after thirteen days of severe labor and hardship, and after encountering a gale in the Gulf Stream. One-fourth of the value was decreed.
[Cited in The Maggie Willett, 27 Fed. 521.]

3. The first mate of the bark, who had refused to volunteer, was given the same share only as the other seamen who remained in the bark.

4. Distribution of the salvage.

In admiralty.

J. C. Dodge and T. K. Lothrop, for libelants.

H. C. Hutchins and J. C. Carter, for claimants.

LOWELL, District Judge. On the afternoon of the twenty-first day of January, 1867, the bark Flora Southard, proceeding in ballast from Boston to Philadelphia, and having on board most of the supplies necessary for the voyage to Rio de Janeiro, which she had agreed to undertake from Philadelphia, and valued with her stores at about thirty thousand dollars, fell in with the schooner Lovett Peacock, in distress, in latitude 37° 15′ N. and longitude 70° 30′ W., some three hundred miles from any land. The schooner had a signal flying, and as the vessels came within hail, her master said he was short of bread, flour, and water, had lost his sails, and his

---

1 [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

crew were exhausted. The master of the bark replied that he could furnish him with bread, but that he had himself lost several sails; he lowered a boat and sent his mate on board the schooner with two barrels of bread, and with orders, as he testified, to inquire into the wants of the schooner, and to bring the master on board for consultation, if he wished to come. When this boat reached the schooner, the mate was told that he need not put the bread on board as the schooner was to be abandoned. The mate carried back to the bark a part of the schooner's crew, and the remainder followed with the officers and the captain's wife in the schooner's boat. When all had been safely received on board, the bark filled away and stood on her course, it being then about eight o'clock in the evening and the weather very threatening. At about eleven o'clock the master of the bark, finding that the wind was going down, put his vessel about and returned to look for the schooner, which had a very valuable cargo of cotton on board, appraised by order of court with the schooner at ninety thousand dollars and upwards. Before daylight in the morning the two masters went on board the schooner, and Captain McIntire of the bark was satisfied that she could be brought in. When they returned to the bark Captain Reagan of the schooner called his men aft and asked them to go in the schooner, and they refused. Captain McIntire then asked his own mate to undertake the service, and he refused; the second mate of the bark consented, and with four volunteers from the bark's crew went on board, with two barrels of bread and two sails, and after thirteen days succeeded in bringing the vessel into Holmes Hole in this district. During three successive days of the thirteen the schooner was obliged to lie to in the Gulf Stream in a severe gale, and the men were almost constantly at the pumps, the officer taking his turn with them both then and afterwards.

The disputed points were, whether the master of the bark took any unfair advantage of his position to obtain the control of the salvage enterprise, and how far the vessel was in peril, and what was the conduct of the schooner's master at the beginning and during the continuance of the salvage service. The master of the schooner swore that he was ready and anxious to proceed on his voyage, but that his men deserted him, and that even then all he wanted was men, provisions, and sails; that sails and men were refused him; that Captain McIntire exaggerated the damage to the schooner in order to discourage him while enhancing the value of his own services.

LOWELL, District Judge. I am entirely satisfied that the imputations on Captain McIntire's conduct are untrue. The only foundation for them is the qualified refusal of sails on the first day, which is satisfactorily explained by Captain McIntire, and which I do not believe had any influence on the result. Upon all the evidence it is clear that master, officers, and men of the schooner thought it prudent and proper to abandon her. She had met a great deal of bad weather; had lost all her large sails, and one of her boats; was much strained and damaged in her upper works, so as to leak badly in heavy weather; her cabin and house were both so injured as to let in the cold and wet; her officers, and a double crew that she happened to have, were exhausted and disabled. Whether Captain Reagan ought to have despaired of his ship, while her hull remained sound, is a different question. His conduct is of importance chiefly in this respect, that if he was, as he would have us believe he was, the promoter of the salvage enterprise, and able and willing to lead it, and the bark's crew were willing to go with him, Captain McIntire certainly had no right to attempt to enhance the service by sending an officer who was not needed; and such conduct would diminish his compensation and perhaps that of his principals, the owners, though it might not affect that of the actual salvors who were no parties to it. This line of evidence, too, has a bearing upon the amount of peril, as it appeared to the parties at the time. The truth appears to me to be that Captain McIntire believed, and openly and without any concealment said, that the schooner could be saved; that in this opinion he differed from all the other persons who had any means of knowledge; that if Captain Reagan did not agree with the majority, he at least presented that appearance, which is all that is important in this case, as it is all that can affect the salvors.

Such being the state of affairs the question arises and has been earnestly argued, whether this is a case of derelict. I cannot think it was, because the final abandonment by the owners and the occupation by the salvors were contemporaneous acts, and the one would probably never have happened unless in a situation where the other was possible, since the boat of the schooner was not capable of taking off all her crew. So that the owners of the saved property must be credited with the chance, whatever it may have been worth, of the schooner making Bermuda, which she was undertaking to do when fallen in with by the bark, and not merely with the chance of a vessel abandoned on the high seas being picked up. I have always strongly insisted upon the distinction between a vessel disabled at sea and one abandoned there, and again between a vessel abandoned at sea and one abandoned on a frequented coast where assistance can be obtained, because an attention to these distinctions seems to me to reconcile many of the most apparently conflicting decisions upon the quantum of salvage. The true point here is, that not merely the risk the vessel is in of present or early damage or destruction must be looked at, but the peril that the owner is in of never re-

covering his property; so that I consider a vessel found floating at sea, however sound she may be and however fair the weather, is in the greatest danger of being lost to the owner; while a vessel much more shattered, with a crew still on board, though willing and anxious to abandon her if they could, is really in a more hopeful state, so far as the owner is concerned,—the accomplished fact of abandonment on the high seas, no matter for what reasons, being a most important one in this respect. Looking thus at the present case it does not appear to be one of derelict in the strictest sense, but it does appear to present a salvage service of a very high degree of merit. I cannot but look at the chances of safety from the point of view of the persons on the spot at the time; and I find that all of them, with the single exception of Captain McIntire (for his second mate had not been on board the schooner when he gallantly offered his services), despaired of saving the property. The plan was conceived by him, and was well and faithfully carried out by the second mate and the four men, with some risk and much exertion and fatigue, continued for thirteen days, and this very valuable cargo has been saved by their exertions from a peril which must by the consent of all be taken to have been very great; for Captain McIntire himself so considered it when he found how bad the weather was during the next few days; and every one else was of that opinion before.

It is therefore a case for very liberal compensation. And I consider that I do not go too far in decreeing, as I do, one-fourth of the net value, or twenty-two thousand five hundred dollars. The distribution will be governed by the circumstances of the case as applied to the general rules in salvage. The owners appear to be entitled to the usual share of one-third; the master, who was the only originator and instigator of the whole enterprise, and the second mate who conducted it to a successful conclusion, giving the work of his hands as well as of his head, and the men who were with him, are all to be highly considered. The men who remained on board the bark are entitled to some share, but they neither underwent the actual hardship and whatever there was of danger, nor were they exposed to much additional labor, for they had the assistance of the shipwrecked crew to some considerable extent in place of those who went in the schooner. The first officer who refused, as he had a right to do, to give the aid of his skill and experience, cannot expect much. Lord Stowell once refused to give any thing to a mate under somewhat similar circumstances. But as the salvors have received the benefit of his services on board the bark, I shall give him the share of a man. The distribution then will be as follows:

To the owners of the Flora Southard, one-third; to the master, one-sixth; to the second mate, one-ninth; to the four men, actual salvors, $1100 each; to the six persons who remained on board the bark (exclusive of the master), the remaining sum of $4350, to be divided between them in proportion to their wages, except that the mate is to rate as an able seaman only.