## THE BARK CLEONE.

*(District Court, D. California. March 10, 1881.)*

1. SALVAGE—DERELICT—COMPENSATION.

   If a vessel be found, though with no one on board, under such circumstances that the persons assuming to be salvors knew, or ought to have known, that their services were not desired, and they take possession with intent to supplant the master and owners in giving her relief, they have no claim for compensation.

2. SAME—SAME—POSSESSION.

   Unless a vessel has been utterly abandoned, and is, in contemplation of law, a *derelict*, even *bona fide* salvors have no right to the exclusive possession, and are bound to give up charge to the master on his appearing and claiming charge.

3. SAME—SAME—SAME.

   A stranded vessel, laden with a valuable cargo, was left but not abandoned by the master, having been placed in charge of an agent

until he could return in another vessel to recover both the cargo and wreck. *Held*, that such vessel and cargo could not be taken possession of by a stranger, who was fully advised of these facts, and knew that the master was then on his way in another vessel to take possession.

4. SAME—SAME—COMPENSATION.

*Held, further*, that the mere fact of placing a man on board, with the object of anticipating and supplanting the master, would not entitle such stranger to a share of the property, which was subsequently recovered by the unaided efforts of the master.—[ED.

Libel for Salvage Compensation.

*Geo. B. Merrill*, proctor for libellant.

*Milton Andros*, proctor for respondent and claimants.

HOFFMAN, D. J. On the fifteenth of October, 1879, the bark Cleone, which had just completed a successful whaling voyage in the Arctic ocean, came to anchor in St. Lawrence bay, near the northerly entrance to Behring's straits. On the 19th her chains parted in a gale of wind, and a short time afterwards she was driven ashore on a sandy beach in the north-east part of the harbor, where she bilged and filled with water. After the gale subsided she lay on her starboard side, "very still and quiet," in 12 feet of water. The season was far advanced, and Captain Nye, the master, at once set about transferring such portion of the cargo and outfit as was accessible to the Helen Mar, which was then lying in the harbor. He put on board the latter vessel the whalebone he had obtained, provisions, articles of clothing, furniture, etc., etc. He left on board the Cleone 115 barrels sperm oil, 1,300 barrels whale oil, blubber, and some materials, shooks, casks, etc. He finally quitted the ship with his crew on the twenty-second of October. It was of course impossible for any of his crew to encounter the rigors and darkness of an Arctic winter in a stranded vessel filled with ice. The master therefore made the best arrangement for the care and preservation of his property that was practicable by placing it in charge of a native chief, whose fidelity he endeavored to secure by liberal presents, and by promises of further reward if on his return in the ensuing season he should find the vessel and cargo undisturbed. He gave to the chief and his wives a quantity

of cloth, dishes, and articles from the pantry, four kegs of powder, some shot, caps, and cartridges, and a fowling piece. Captain Nye also delivered to the native chief a letter or notice, stating that the vessel had gone ashore in a heavy gale, and that she had been left in charge of the native, with full power to stop anybody from taking anything belonging to her, and that he expected to return and recover all the effects, both oil and wreck, early in the spring. This notice was signed by Captain Nye, and witnessed by Captain Bauldry, of the bark Helen Mar.

Having thus done everything in his power to provide for the safety of his property, and to retain the constructive possession of it during his absence, Captain Nye left for this port in the Helen Mar, after enjoining upon the native to exhibit the letter to the masters of all vessels which might chance to come into the harbor during the ensuing season, before his own return. He arrived at San Francisco November 18th; but, while still at sea, he wrote to his owners a letter, in which, after giving an account of the wreck, he suggested the necessity of making some arrangement for saving the oil, and expressed the opinion that it could all be saved. This project he seems never to have relinquished. In repeated letters he urged upon his owners its entire feasibility, and he declined other employment unless the wrecking of his vessel was included in it. He even announced his determination to undertake the service himself, at his own charges, if his owners declined the enterprise. After a protracted correspondence a contract was at length entered into between the owners of the Cleone, the underwriters, and the owners of the bark Mount Wollaston, by which Captain Nye was to take command of the latter vessel, and, after making a winter whaling voyage to the coast of Mexico, to proceed as soon as the season opened to St. Lawrence bay, and effect the salvage of the Cleone and her cargo. The share of salvage to be paid to the owners, officers, and crew of the Mount Wollaston was fixed by contract, and assented to by all the parties. The Mount Wollaston sailed from this port December 29th, and, after making a winter cruise to the south,

arrived at St. Lawrence bay June 25, 1878. The ice was just beginning to break up, and for two days he was unable to enter the harbor. He was boarded, however, by the interpreter, who informed him of the visit of Captain Dexter and Captain Ravens, presently to be related, and the next day the chief came on board, bringing with him the letter left with him by Captain Nye. On the third day the Mount Wollaston succeeded in entering the harbor. Captain Nye found the Cleone, to all appearance, precisely as he had left her. On going on board of her he ascertained that her decks had been somewhat cut into, and a small quantity of oil taken from her between decks. This, he was informed by the chief, had been done by Indians from the interior, whose depredations the chief was unable to prevent, except by "a war." The great mass of the oil, however, was intact. It was in the lower hold, embedded in ice from six to eight feet in thickness.

Captain Nye had already been informed by the interpreter that Captain Ravens, of the brig Timandra, had some weeks before put a man on board the Cleone, with a view of taking possession of the property. In response to his hail, this man made his appearance. He proved to be a person named Fagin, second mate of the Timandra. He handed to Captain Nye a letter, which the latter declined to read, but he informed Fagin that he had come to the bay for the express purpose of saving his property which he had left there, and he intended to do so. He invited Fagin to go aboard his vessel. This the latter declined, but went on shore and lived with the natives until the arrival of his own vessel. Captain Nye at once proceeded to carry out the object of his voyage, and had made considerable progress towards its accomplishment, and had entered into a contract with the master of the bark Syren, which came into the harbor on the sixth of July, for the shipment of the oil to New Bedford, when Captain Ravens, of the Timandra, arrived, on the eleventh of July.

The circumstances attending the previous visit of Captain Ravens and Captain Dexter must here be adverted to. Captain Dexter, of the Loleta, arrived at the bay about the second

or third of June. He did not approach nearer than eight or ten miles from the wreck, but knew she was there, having heard of it at Honolulu. The natives also reported that she was safe, and the chief exhibited to him Captain Nye's letter. About a week later the Timandra came in, and the two captains went across the ice some eight or ten miles to the wreck. Captain Ravens seems to have urged Captain Dexter to unite with him in taking possession of the vessel by putting a man on board. But this the latter declined, having had, as he said, some experience in wrecking, and being distrustful of the expediency of the measure. Considerations of fair dealing, and regard for the rights of Captain Nye, whom he knew to be on the way to save his property, seem to have formed no part of his motives, for he suggested to the natives to bring to him all the sperm oil they could transport, and he would purchase it; and he endeavored to buy from them one of the Cleone's boats, offering for it a cask of spirits. But their honesty was proof against even this temptation. Their reply was: "Bye and bye Captain Nye come; he no like it." And yet this witness does not hesitate to swear that the natives are such inveterate thieves and liars that, to use his own elegant expression, "you can't trust them as far as you can throw a bull by the tail." However much they may in general be addicted to habits of pilfering, their conduct shows that in this instance, at least, they knew how to be faithful to a trust.

Captain Dexter's refusal to associate himself with Captain Ravens in the enterprise was not final. He informed the latter that he intended to pursue the business of his voyage, but if on his return to the bay he found Captain Ravens still in charge, he would join him if the latter desired. Captain Ravens, having placed Fagin on board, sailed away on the same day, and was followed by Dexter a day or two afterwards. Ravens returned to the bay once or twice afterwards, and on his last trip found Nye in possession and the salvage partially effected, as has been already related. Shortly after his arrival, he and Captain Nye met on board the Syren. Captain Nye was naturally indignant at what he regarded as

an attempt to steal a march on him. "The natives," he said, "have taken some of it, and now the first white man that comes tries to steal the remainder." Captain Ravens, according to Nye's testimony, made no attempt to justify his proceedings. He declared that he did not wish to have anything to do with his (Nye's) oil or ship, but he was ordered by Mr. Merrill, if he could get to St. Lawrence bay ahead of him, "to go for it, and put a man on board at any rate." Captain Ravens' account of this conversation is somewhat different, but Captain Dexter, who testified on the part of the libellant, swears that Ravens stated to him substantially in the same manner the purport of Mr. Merrill's orders. Captain Ravens denies that Nye's letter to the native chief was shown to him, or that he knew that Nye was on his way to the wreck; but in these denials I can place no confidence. When he first proposed to Dexter to join him in taking possession of the vessel, the latter was at first inclined to assent. On further reflection he thought it inexpedient or unsafe to mix himself up in the matter. He had already been shown Nye's letter to the natives, and he knew that Nye was coming in the Mount Wollaston to reclaim his property. He doubted, therefore, and not unnaturally, whether the attempt to get ahead of him would prove successful. He and Ravens had, he testifies, numerous conversations on the subject. He cannot recollect whether he told Ravens about the letter. "I suppose he was shown it just the same as I was." In this supposition I am inclined to agree with him. But it is inconceivable that, in their long conversations on the subject, Dexter should have failed to communicate to Ravens the substance of the letter that had been shown to him, and the fact that Nye was on his way. If Nye's testimony as to Ravens' statement of his owner's orders be true, the point is beyond dispute; for those orders distinctly contemplate his getting to the bay "ahead of Captain Nye."

Dexter's version of these orders as stated to him by Ravens, though Captain Nye's name is not mentioned, evidently contemplates the same contingency. "Ravens told me that Merrill had instructed him that if he got to St. Lawrence

bay, *and had a chance,* to take charge of the vessel." Captain Nye testifies that the fact that he had taken command of the Mount Wollaston with the intention of effecting the salvage of the cargo of the Cleone was well known, he thinks, to every ship-master and officer at this port employed in the northern whaling and trading business; and he states that he communicated his intentions to Mr. Coffin, an acquaintance of 15 years' standing, and who was then chief clerk to Mr. Merrill—a statement which Mr. Coffin has not been called to contradict.

On the whole, the evidence, in my judgment, leads unmistakably to the conclusion that Captain Ravens went into St. Lawrence bay with the expectation of there finding the Cleone; that he knew she had been left in charge of a native chief by Captain Nye, and that the latter intended to return to her to recover his property, and was then on his way thither; that when he put a man on board of her it was not with a view of then entering on a salvage service. This was obviously impracticable, as the ice prevented him from getting nearer to her with his own vessel than eight miles. His design was to take possession of the vessel, and to secure some sort of lien or right to take her cargo, to the exclusion of her owner, at a future time, and whenever circumstances and his own convenience might permit.

The presence of Fagin on board contributed in no degree to the security of the vessel and her cargo. During the eight months that she had lain there the depredations of the natives had been insignificant, and even these were by Indians from the interior, and not by those to whose chief the charge of the vessel had been entrusted. The sealing and fishing season had arrived, and the Indians were no longer in want of food, and the oil in the hold, imbedded in ice six or eight feet thick, was practically inaccessible to them. To obtain it Captain Nye was obliged to have recourse to dynamite. It thus appears not only that no part of the property was saved by Captain Ravens, but that nothing was done by him which contributed appreciably to its safety, or enabled Captain Nye to effect the subsequent salvage. It is true that Fagin nailed

a strip of lead on a cask to stop the leak. This could not have been of much service, as the oil was frozen to the consistency of lard, and Captain Nye offered to pay Fagin for his time, and also to make some compensation to Captain Ravens. But these offers were peremptorily rejected by Ravens, who demanded one-half of all the property saved by Captain Nye, or at least of the oil.

The claim of the libellant to a salvage compensation is thus found not to be based on the performance of any salvage service of appreciable value, but on the fact that the Timandra succeeded in reaching St. Lawrence bay in advance of the Mount Wollaston, and that her master took, or attempted to take, possession of the Cleone with a view of securing the property at a later period in the season. This claim, I think, is wholly inadmissible. The Cleone was not derelict. Her master had neither abandoned the *spes recuperandi*, nor renounced the *animus revertendi*. On the contrary, his correspondence shows that it was not merely his intention, but his fixed and unalterable determination, to recover his property at the earliest practicable moment, and to the carrying out of this determination all other engagements and employments were subordinated. He not only had not abandoned the *spes recuperandi*, but he felt the utmost confidence in the success of the enterprise, persistently urging upon the owners that the certainty of recovering the oil was far greater than that of procuring a similar amount of oil by the catch of an ordinary whaling voyage in the Arctic ocean, while the risk was far less. Nor was the design of returning to the vessel formed after arriving at San Francisco. At the time of quitting the vessel he adopted every means in his power to retain the constructive possession of her, and to notify all comers that she was in charge of a person selected by him, and that he intended to return and recover his property at the opening of the next season.

Under these circumstances it is impossible to treat the vessel as derelict. As well might the goods or "trade," as they are called, which it appears to be not unusual for vessels to leave in charge of natives, at "stations" in the Arctic ocean,

to await their return in the ensuing season, be pronounced derelict and liable to seizure by the first comer. *Tyson* v. *Prior*, 1 Gal. 133; *The Aquila*, 1 C. Rob. 37–41; *The Bee*, 1 Ware, 336; *The Cosmopolitan*, 6 Notes Cases, (supplement,) 17; *The Barefoot*, 1 Eng. L. & Eq. 661; *The India*, 1 Wm. Rob. 409; *The Lovett Peacock*, 1 Lowell, 143.

The vessel not being derelict, but, on the contrary, in charge of an agent appointed by the master, whose intention to return was known to Captain Ravens, the latter had no right to take, or attempt to take, possession of her.

To entitle a party to salvage, not only must the service rendered be meritorious, but the possession taken must be lawful. *Clarke* v. *The Brig Healey*, 4 Wash. 656; *The Barefoot*, 1 Eng. L. & Eq. 661.

By quitting the vessel the master and owner does not lose his *jus disponendi* or right of property. If a vessel be found, though with no one on board, under such circumstances that the persons assuming to be salvors knew, or ought to have known, that their services were not desired, and they take possession with intent to supplant the master and owners, in giving her relief, they have no claim for compensation. *The Upnor*, 2 Hag. 3; *The Barefoot, ubi supra; The India*, 1 W. Rob. 406; *The Amethyst*, Davies R. 23. See argument of counsel (the late Mr. J. Curtis) in *The Island City*, 1 Black, 126; *The Champion*, Br. & Lush. Adm. R. 69.

These authorities establish beyond controversy the principle so agreeable to justice and reason, that unless the vessel has been utterly abandoned, and is, in contemplation of law, a *derelict*, even *bona fide* salvors have no right to the exclusive possession, and are bound to give up charge to the master on his appearing and claiming charge. See *The Champion, ubi supra.*

It is not to be tolerated that a stranded vessel with a valuable cargo may be taken possession of by a stranger who knows that she has been left, but not abandoned; that she has been put in charge of an agent of the master, and that the latter intends to return to her, and is actually on his way to her for that purpose; nor that the mere fact of placing a

man on board, with the object of anticipating and supplanting the master, shall entitle him to a share of the property which is subsequently recovered by the unaided efforts of its owner.

The libel must be dismissed, with costs.

---

### THE HERO.[*]

*(District Court, E. D. Pennsylvania. March 23, 1881.)*

1. CHARTER-PARTY—OBTAINING SIGNATURE BY FRAUD—BROKER WHEN AGENT OF ONE PARTY ALONE.

F., a ship-broker in New York, sent to H., a ship-broker in Philadelphia, the name of a vessel open to charter in case H. could obtain any proposals. H. obtained an offer from P. W. & Sons, which was accepted. The charter was drawn in P. W. & Sons' office, and marked by the employe in charge of their chartering department with his initials, which, according to a system adopted by P. W. & Sons, and known to H., indicated to P. W. & Sons that the charter was correct and might be signed without further examination. The charter was forwarded to F., who, after altering it by an interlineation, signed it and returned it to H., who left it at the office of P. W. & Sons without mentioning the alteration. P. W. & Sons signed it without noticing the alteration, and sent it to H., but shortly afterwards, discovering the fraud, rescinded the contract. *Held*, that H. was not the agent of P. W. & Sons, but of the ship, and that P. W. & Sons were not liable on their charter-party.

Libel by the master of the bark Hero against Peter Wright & Sons to recover damages for an alleged breach of charter-party. The testimony disclosed the following facts: Funch, Edye & Co., ship-brokers of New York, sent to Hoffman & Meyer, ship-brokers of Philadelphia, the name of the bark Hero (then at Cartagena) as a vessel open to charter in case Hoffman & Meyer could obtain any proposals. Hoffman & Meyer obtained an offer from Peter Wright & Sons, of Philadelphia, which was accepted. The charter was then drawn by a clerk in the employ of Peter Wright & Sons and sub-

*Reported by Frank P. Prichard, Esq., of the Philadelphia bar.