**E. H. WIGGINS and W. E. Moulton, Libellants,**

v.

**1100 TONS, MORE OR LESS, OF ITALIAN MARBLE, Respondents.**

No. 8115.

United States District Court E. D. Virginia, Norfolk Division.

Sept. 12, 1960.

Walter B. Martin, Jr., Norfolk, Va., for libellants.

David H. Batchelder, Jr., Norfolk, Va. (for claimants, Beavers and Burchard).

WALTER E. HOFFMAN, District Judge.

On January 22, 1894, the Norwegian Barkentine Clythia, bound from Genoa, Italy, for Baltimore, Maryland, went aground approximately 250 yards off the shores of Princess Anne County, Vir-

ginia, near the Virginia-North Carolina line. The good ship has rested upon the bottom for the past 66 years with only a portion of her top mast visible above the water. After all these years the Clythia has been partially restored to life due to the salvage interests in her cargo consisting of approximately 1100 tons of Italian marble, the value of which is dependent, in part, upon the ability of the seller to find a favorable purchaser.

The libellants have raised and removed from the vessel 123 tons of marble which have been attached under process of this Court at the instance of libellants who desire to be declared as finders of the salved cargo or, in the alternative, they seek that the marble be sold to satisfy the salvage lien.

As far back as 1951, the libellant, Moulton, began making inquiries as to the wreck of the vessel. After ascertaining the whereabouts of the wreck and determining the nature of her cargo, libellants did nothing until 1960 when they entered into a partnership for the purpose of salvaging the cargo of marble. Libellant, Wiggins, owned the vessel Big Wig and the parties expended in excess of $3,000 equipping same. With a crew of five members, they took possession of the Clythia on July 1, 1960. Through the process of dynamiting, libellants successfully brought to the surface and removed 123 tons of marble. Their service was performed in rough seas and under conditions which were decidedly hazardous. On or about July 29, 1960, the storm Brenda, with winds up to 71 m. p. h., severely damaged and beached the Big Wig.

When questioned concerning continued salvage activities, Moulton stated that future plans were uncertain due to the necessity of repairing the Big Wig at considerable expense, the hazard of the undertaking, and the approach of the hurricane season to be followed by cold weather. As to contemplated further action in the spring and summer of 1961, Moulton remained uncertain and, as to this litigation, libellants seek only a determination of their rights as to the 123 tons of marble already salvaged. Apparently it is an "open season" for anyone electing to participate in salvage operations in the future, and such rights will have to be determined as and when they arise. Surely, neither the libellants nor the claimants, Ronald W. Beavers and David V. Burchard, can continue to assert possession of the Clythia and her remaining cargo to the exclusion of all others, where their plans are indefinite and uncertain.

This brings us to a consideration of the claims of Beavers and Burchard who have appeared herein. These individuals, having had considerable experience in diving, first became interested in the Clythia during 1955. Several years later they approached the Army Engineers and were advised that since the wreck was not an obstruction to navigation, the Engineers had no jurisdiction over the matter. In 1959 they approached F. Mason Gamage, the Commissioner of Wrecks for Princess Anne County, Virginia, and secured from him a letter dated September 10, 1959, which reads as follows:

"This is to advise you that you are granted permission to undertake salvage operations on the wreck of the Clythia, located near False Cape, Princess Anne County, Virginia.

"The commissioner of wrecks is entitled to 5% of the value of the salvaged material up to $10,000 in value and 2% thereafter. Salvage rights are granted subject to these conditions.

"This permission will entitle you to exclusive salvage rights for a 12 month period beginning October 1, 1959, to October 1, 1960.

"Contact me at Princess Anne Court House or at Norfolk, Gy 7-3364, 30 days before you undertake this venture."

Gamage, as an individual, knew of the existence of the wreck as he had fished in that area. He also knew of the rumor as to the nature of the cargo. He was appointed Commissioner of Wrecks by

former Governor Thomas B. Stanley on some date between January, 1954, and January, 1958, during the administration of Governor Stanley. Gamage serves as Director of Planning for Princess Anne County, and his compensation and duties as Commissioner of Wrecks are governed by Virginia law. Code of Virginia, 1950, § 62–158 to § 62–174, both inclusive.

The Wreck Commissioner concedes that he took no action with respect to the Clythia, other than the writing of the aforesaid letter. He made no inventory of the vessel or its cargo, and took no steps to take possession of same. He hired no guards, employed no laborers, and, in effect, treated the wreck as a derelict available to the public. The background of the letter written by the Wreck Commissioner is that the request was made by Beavers and Burchard, the contents were substantially dictated by them, and Gamage wrote the letter as per their request. He heard nothing further about the matter until a proctor for one of the present libellants inquired with respect to the Clythia during the late spring of 1960.

If the Commissioner of Wrecks had the lawful authority to grant *exclusive* salvage rights to Beavers and Burchard, there can be little doubt as to the fact that they should prevail. The libellants were fully advised as to the purported grant of exclusive salvage rights when they commenced operations and took possession of the vessel and her cargo.

■ We do not reach the serious constitutional question as to the right of a state to lay claim to wrecked property, as opposed to the policy of maritime law encouraging the recovery of distressed property by holding out the right to be liberally rewarded. An analysis of the Wreck Commissioner statutes does not lead to the belief that the Wreck Commissioner is legally placed in possession of all wrecks and their contents by operation of law. The Virginia statutes have remained, without change, as laws of this state since 1792, a time when sailing vessels were frequently unable to withstand the perils of the sea and the public was more prone to pilfer property from the vessel. The statute does, we believe, grant to the Wreck Commissioner the right to take possession for the purpose of assistance and preservation but, as noted in The Ida L. Howard, D.C.Mass., 12 Fed.Cas. page 1163, No. 6,999, possession must be taken by the Wreck Commissioner under the Massachusetts statute.

■ A fair reading of the Virginia statute leads to the conclusion that it was originally designed for the purpose of designating a state official who could be placed in charge of the wreck and its cargo to the end that it may be preserved for the ultimate benefit of the owner. The statute gives no authority to the Wreck Commissioner to grant exclusive salvage rights. Indeed, it is extremely doubtful that any such statute could be constitutionally enacted. Certainly it is true that after 65 years, with no action ever having been taken by the Commissioner of Wrecks, his authority to grant such an exclusive right is no greater than that of any individual.

■ The expressed interest of Beavers and Burchard in conducting salvage operations falls far short of meeting the essentials of possession. They contend that, following their conference with the Commissioner of Wrecks in September, 1959, they made several dives in early May, 1960, to examine the cargo. They submitted an inventory of gear and equipment which they claim had been acquired or were available. Many of these items are normal equipment in the business of professional divers. Some of the larger equipment to be used in the recovery process had not been acquired, although one of the claimants knew where it could be obtained from a friend with whom he had never discussed the matter. What was done by the claimants herein is substantially similar to the activities of the claimant in The African Queen, D.C.Va., 179 F.Supp. 321, 324, 1960 A.M.C. 69, where this Court said:

"A salvor cannot assert a claim merely by boarding a vessel and pub-

lishing a notice, unless such acts are coupled with a then present intention of conducting salvage operations, and he immediately thereafter proceeds with activity in the form of constructive steps to aid the distressed property. When he finally determines that he will, in good faith, conduct such operations and pursues his constructive steps, he is then, and only then, in a position to assert this claim subject to the rights of others which may have intervened while he is exploring the prospects of such operations."

Beavers and Burchard were professional divers employed by Pan American World Airlines at the time they acquired their letter from the Commissioner of Wrecks. They have since separated, with one entering the service of the Government engaged in recapturing missile cones, and the other accepting employment of a mechanical nature in Florida. Any suggestion that they intended to conduct salvage operations during the summer of 1960 is considerably weakened when one of the claimants stated their intention to seek a one year renewal of their so-called exclusive salvage rights permit.

■ There is a conflict of authority on the subject of the rights of parties who reduce to possession the cargo of a wrecked vessel long since abandoned. The Law of Salvage by that eminent authority, Martin J. Norris, states that a "find" denotes that the property has never been owned by any person. The Law of Salvage (1958), § 158, p. 258. If there be an affirmative act of abandonment such as in The African Queen, supra, it is, in effect, a repudiation of ownership and the party taking possession under salvage operations may be considered a finder under the doctrine of *animus revertendi*, i. e., the owner has no intention of returning. The Port Hunter, D.C.Mass., 6 F.Supp. 1009; The Bark Cleone, D.C.Cal., 6 F. 517, 524. In Eads v. Brazelton, 22 Ark. 499, it is intimated that the lapse of years will

enable a salvor in possession to be characterized as a finder acquiring title good against the owner.

In support of his view that title to abandoned wrecks or cargo is never lost, Mr. Norris cites The Akaba, 4 Cir., 54 F. 197; The Bark Cleone, supra, and The Port Hunter, supra. These cases are not, in the main, controlling. They involve instances in which the personalty (wire hawser) had been separated from the vessel (The Akaba); the intention to return to the vessel was apparent (The Bark Cleone); and the acts of the owners and their successors in title over a period of 15 years negated any intent to abandon the vessel (The Port Hunter).

■ For a period of 66 years the derelict vessel and her cargo have remained in the exact location. While lapse of time and nonuser are not sufficient, in and of themselves, to constitute an abandonment, these factors may, under certain circumstances, give rise to an implication of intention to abandon. 1 C.J.S. Abandonment § 4, p. 13. It is, essentially, a question of fact but, in this case, only one inference may be drawn therefrom. Holding that the vessel and its cargo have long since been voluntarily abandoned, the following rule applies (1 C.J.S. Abandonment § 9 p.18):

"Personalty, on being abandoned, ceases to be the property of any person, and thenceforth is no man's property, unless and until it is reduced to possession with intent to acquire title to, or ownership of, it. It may, accordingly, be appropriated by anyone, if it has not been reclaimed by the former owner, and ownership of it vests, by operation of law, in the person first lawfully appropriating it and reducing it to possession with intention to become its owner, provided, it has been said, the taking is fair. One so appropriating abandoned property, or any third person whom he may allow to take it, has a right to the property superior even to that of the former owner, and may hold it against him."

■ This Court is unable to perceive why cargo, remaining in the hull of a derelict vessel for 66 years with no claim of ownership, must now be sold by the Marshal to clear title to same. However, as the ultimate burden must rest upon the successful libellants, a decree will be entered declaring their ownership of the 123 tons of marble removed from the wreck or, in the alternative, the aforesaid 123 tons may be sold under order of Court.

■ The Court finds that the Commissioner of Wrecks, having never appropriated or taken possession of the Clythia or her cargo, is not entitled to the commissions specified by § 62–165 of the Code of Virginia, 1950.

Present decree on notice.