FRED S. FAVORITE ET AL. *v.* LOUIS MILLER

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued October 18—decision released December 12, 1978

*Harry M. Lessin,* with whom, on the brief, was *Abraham D. Slavitt,* for the appellant (defendant).

*Walter Marcus,* with whom, on the brief, were *Andrew G. Brucker, Stephen N. Schaffer* and *Richard S. Weinstein,* for the appellees (plaintiffs).

BOGDANSKI, J. On July 9, 1776, a band of patriots, hearing news of the Declaration of Independence, toppled the equestrian statue of King George III, which was located in Bowling Green Park in lower Manhattan, New York. The statue, of gilded lead, was then hacked apart and the pieces ferried over Long Island Sound and loaded onto wagons at Norwalk, Connecticut, to be hauled some fifty miles northward to Oliver Wolcott's bullet-molding foundry in Litchfield, there to be cast into bullets. On the journey to Litchfield, the wagoners halted at Wilton, Connecticut, and while the patriots were imbibing, the loyalists managed to steal back pieces of the statue. The wagonload of the pieces lifted by the Tories was scattered about in the area of the Davis swamp in Wilton and fragments of the statue have continued to turn up in that area since that time.[1]

Although the above events have been dramatized in the intervening years, the unquestioned historical facts are: (1) the destruction of the statue; (2) cartage of the pieces to the Wolcott foundry; (3) the pause at Wilton where part of the load was scattered over the Wilton area by loyalists; and (4) repeated discoveries of fragments over the last century.

In 1972, the defendant, Louis Miller, determined that a part of the statue might be located within property owned by the plaintiffs. On October 16 he entered the area of the Davis Swamp owned by the

---

[1] The fascinating story of the journey which these pieces of lead took following the revolution is fully narrated in the New York Times of February 4, 1973; Nooks and Corners of Old New York (American Heritage series, Charles Scribner's 1899); Andrist, "Alas, Poor George, Where Is Your Head?" Smithsonian, September, 1974, and in numerous books familiar to students of American history.

plaintiffs although he knew it to be private property. With the aid of a metal detector, he discovered a statuary fragment fifteen inches square and weighing twenty pounds which was embedded ten inches below the soil. He dug up this fragment and removed it from the plaintiffs' property. The plaintiffs did not learn that a piece of the statue of King George III had been found on their property until they read about it in the newspaper, long after it had been removed.

In due course, the piece of the statue made its way back to New York City, where the defendant agreed to sell it to the Museum of the City of New York for $5500. The museum continues to hold it pending resolution of this controversy.

In March of 1973, the plaintiffs instituted this action to have the fragment returned to them and the case was submitted to the court on a stipulation of facts. The trial court found the issues for the plaintiffs, from which judgment the defendant appealed to this court. The sole issue presented on appeal is whether the claim of the defendant, as finder, is superior to that of the plaintiffs, as owners of the land upon which the historic fragment was discovered.

Traditionally, when questions have arisen concerning the rights of the finder as against the person upon whose land the property was found, the resolution has turned upon the characterization given the property. Typically, if the property was found to be "lost" or "abandoned," the finder would prevail, whereas if the property was characterized as "mislaid," the owner or occupier of the land would prevail.

Lost property has traditionally been defined as involving an involuntary parting, i.e., where there is no intent on the part of the loser to part with the ownership of the property. *Foster* v. *Fidelity Safe Deposit Co.*, 264 Mo. 89, 174 S.W. 376 (1915); *Kuykendall* v. *Fisher*, 61 W. Va. 87, 56 S.E. 48 (1906); 1 Am. Jur. 2d 4, Abandoned, Lost, and Unclaimed Property § 2; annot., 170 A.L.R. 706. Abandonment, in turn, has been defined as the voluntary relinquishment of ownership of property without reference to any particular person or purpose; *Ellis* v. *Brown*, 177 F.2d 677 (6th Cir. 1949); *Jackson* v. *Steinberg*, 186 Or. 129, 200 P.2d 376 (1948), rehearing denied, 186 Or. 129, 205 P.2d 562 (1949); annot., 170 A.L.R. 708; i.e., a "throwing away" of the property concerned; *Foulke* v. *New York Consolidated R. Co.*, 228 N.Y. 269, 273, 127 N.E. 237 (1920); while mislaid property is defined as that which is intentionally placed by the owner where he can obtain custody of it, but afterwards forgotten. *Foster* v. *Fidelity Safe Deposit Co.*, supra; *Loucks* v. *Gallogly*, 1 Misc. 22, 23 N.Y.S. 126 (1892); annot., 9 A.L.R. 1388, 1390.

It should be noted that the classification of property as "lost," "abandoned," or "mislaid" requires that a court determine the intent or mental state of the unknown party who at some time in the past parted with the ownership or control of the property.

The trial court in this case applied the traditional approach and ruled in favor of the landowners on the ground that the piece of the statue found by Miller was "mislaid." The factual basis for that conclusion is set out in the finding, where the court found that "the loyalists did not wish to have the pieces [in their possession] during the turmoil sur-

rounding the Revolutionary War and hid them in a place where they could resort to them [after the war], but forgot where they put them."

The defendant contends that the finding was made without evidence and that the court's conclusion "is legally impossible now after 200 years with no living claimants to the fragment and the secret of its burial having died with them." While we cannot agree that the court's conclusion was legally impossible, we do agree that any conclusion as to the mental state of persons engaged in events which occurred over two hundred years ago would be of a conjectural nature and as such does not furnish an adequate basis for determining rights of twentieth century claimants.

The defendant argues further that his rights in the statue are superior to those of anyone except the true owner (i.e., the British government). He presses this claim on the ground that the law has traditionally favored the finder as against all but the true owner, and that because his efforts brought the statue to light, he should be allowed to reap the benefits of his discovery. In his brief, he asserts: "As with archeologists forever probing and unearthing the past, to guide man for the betterment of those to follow, explorers like Miller deserve encouragement, and reward, in their selfless pursuit of the hidden, the unknown."

There are, however, some difficulties with the defendant's position. The first concerns the defendant's characterization of himself as a selfless seeker after knowledge. The facts in the record do not support such a conclusion. The defendant admitted that he was in the business of selling metal detectors and that he has used his success in finding the statue

as advertising to boost his sales of such metal detectors, and that the advertising has been financially rewarding. Further, there is the fact that he signed a contract with the City Museum of New York for the sale of the statuary piece and that he stands to profit thereby.

Moreover, even if we assume his motive to be that of historical research alone, that fact will not justify his entering upon the property of another without permission. It is unquestioned that in today's world even archeologists must obtain permission from owners of property and the government of the country involved before they can conduct their explorations. Similarly, mountaineers must apply for permits, sometimes years in advance of their proposed expeditions. On a more familiar level, backpackers and hikers must often obtain permits before being allowed access to certain of our national parks and forests, even though that land is public and not private. Similarly, hunters and fishermen wishing to enter upon private property must first obtain the permission of the owner before they embark upon their respective pursuits.

Although few cases are to be found in this area of the law, one line of cases which have dealt with this issue has held that except where the trespass is trivial or merely technical, the fact that the finder is trespassing is sufficient to deprive him of his normal preference over the owner of the place where the property was found. *Barker* v. *Bates,* 30 Mass. (13 Pick.) 255, 23 Am. Dec. 678 (1832) ; Brown, Personal Property (2d Ed.) § 12, p. 24, n.10; *Hibbert* v. *McKiernan,* 2 K.B. 142 (1948). The basis for the rule is that a wrongdoer should not be allowed to profit by his wrongdoing. Note, 21 Minn. L. Rev.

191 (1937); Morton, "Public Policy and the Finders Cases," 1 Wyo. L.J. 101, 105 (1947). Another line of cases holds that property, other than treasure trove,[2] which is found embedded in the earth is the property of the owner of the locus in quo. *Allred v. Biegel,* 240 Mo. App. 818, 219 S.W.2d 665 (1949) (prehistoric Indian canoe); *Ferguson v. Ray,* 44 Or. 557, 77 P. 600 (1904); *Schley v. Couch,* 155 Tex. 195, 284 S.W.2d 333 (1955); *South Staffordshire Water Co. v. Sharman,* 2 Q.B. 44 (1896); *Elwes v. Brigg Gas Co.,* 33 Ch. 562 (1886) (prehistoric boat); 1 Am. Jur. 2d 20, Abandoned, Lost, and Unclaimed Property § 21; 1 Am. Jur. 2d 6, op. cit., § 4; annot., 170 A.L.R. 708; Brown, Personal Property (2d Ed.) § 12, pp. 26, 27. The presumption in such cases is that possession of the article found is in the owner of the land and that the finder acquires no rights to the article found. *Ferguson v. Ray,* supra; *Burdick v. Chesebrough,* 94 App. Div. 532, 88 N.Y.S. 13 (1904); *Groover v. Tippins,* 51 Ga. App. 47, 179 S.E. 634 (1935) (dictum).

The defendant, by his own admission, knew that he was trespassing when he entered upon the property of the plaintiffs. He admitted that he was told by Gertrude Merwyn, the librarian of the Wilton Historical Society, *before* he went into the Davis Swamp area, that the land was privately owned and that

---

[2] Treasure trove has traditionally been strictly and narrowly defined as "any gold or silver in coin, plate, or bullion found concealed in the earth or in a house or other private place." 1 Am. Jur. 2d 6, Abandoned, Lost, and Unclaimed Property § 4. This strict definition is well established in American law. *Ferguson v. Ray,* 44 Or. 557, 77 P. 600 (1904); *Danielson v. Roberts,* 44 Or. 108, 74 P. 913 (1904) (gold coin); *Zech v. Accola,* 253 Wis. 80, 33 N.W.2d 232 (1948) (paper certificates); 1 Am. Jur. 2d 6, op. cit., § 4; annot., 170 A.L.R. 707. Since the fragment of the statue recovered by the defendant was of gilded lead, he makes no claim that the fragment constituted treasure trove.

Mrs. Merwyn recommended that he call the owners, whom she named, and obtain permission before he began his explorations. He also admitted that when he later told Mrs. Merwyn about his discovery, she again suggested that he contact the owners of the property, but that he failed to do so.

In the stipulation of facts submitted to the court, the defendant admitted entering the Davis Swamp property "with the belief that part of the 'King George Statue' . . . might be located within said property and with the intention of removing [the] same if located." The defendant has also admitted that the piece of the statue which he found was embedded in the ground ten inches below the surface and that it was necessary for him to excavate in order to take possession of his find.

In light of those undisputed facts the defendant's trespass was neither technical nor trivial. We conclude that the fact that the property found was embedded in the earth and the fact that the defendant was a trespasser are sufficient to defeat any claim to the property which the defendant might otherwise have had as a finder.

Where the trial court reaches a correct decision but on mistaken grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it. *Morris* v. *Costa,* 174 Conn. 592, 392 A.2d 468; *DiMaggio* v. *Cannon,* 165 Conn. 19, 24, 327 A.2d 561. The present case falls within the ambit of that principle of law and we affirm the decision of the court below.

There is no error.

In this opinion the other judges concurred.