Joan **KLEIN, as personal representative of the estate of Gerald Joseph Klein, Deceased, Plaintiff,**

v.

**UNIDENTIFIED, WRECKED AND ABANDONED SAILING VESSEL (Believed to have sunk in 1740), her tackle, armament, apparel and cargo located within 3,000 yards of a point: Beginning at coordinates 25°29′N latitude and 80°05′W longitude or within Legare Anchorage, Florida, Defendant.**

No. 79–4627–Civ–CA.

United States District Court,
S.D. Florida.

Aug. 17, 1983.

David Paul Horan, Key West, Fla., and David F. McIntosh, Miami, Fla., for plaintiff.

Rebecca A. Donnellan, Atty., Land and Resources Div., Dept. of Justice, Washington, D.C., and Lloyd Bates, Asst. U.S. Atty., Miami, Fla., for U.S.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ATKINS, District Judge.

THIS CAUSE was heard without a jury to confirm title in and possession of an "unidentified, wrecked and abandoned sailing vessel" discovered by the original plaintiff, Gerald Joseph Klein,[1] in the summer of 1978. The plaintiff seeks, in the alternative, a full and liberal salvage award. The United States intervened as a claimant to the wreck after an examination of the coordinates revealed that the abandoned vessel lay not only within the three mile territorial limit but also rested in submerged government property within the national park system known as Biscayne National Monument.[2] The government sought and the Court granted a preliminary injunction prohibiting further salvage efforts by the plaintiff.

---

1. Gerald Klein died on January 1, 1982. His wife, Joan Klein, has been substituted as personal representative.

2. Biscayne National Monument was established by statute in 1968. 16 U.S.C. § 450qq. In 1980 the Monument was abolished and all property and interest were incorporated into Biscayne National Park. 16 U.S.C. § 410gg.

Upon careful review and consideration of the evidence and argument of respective counsel, I find that the abandoned vessel is the property of the United States. The plaintiff is therefore permanently enjoined from conducting salvage activities at the site of the subject wreck. It is also my determination that the plaintiff is not entitled to a salvage award. I base this decision on the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

1. Gerald Klein found the defendant wreck in the summer of 1978 while sport diving with some friends.

2. Gerald Klein first brought artifacts removed from the wreck to the attention and custody of this Court on October 4, 1979.

3. The remains of the vessel claimed by the plaintiff in this action lie entirely within the confines of Biscayne National Park and entirely within the submerged lands of the territorial sea of the United States.

4. The remains of the vessel claimed by plaintiff lie entirely within lands owned and administered by the United States as part of the national park system.

5. All of the artifacts removed from the remains of the vessel claimed by plaintiff, which are listed on an inventory of custodianship dated October 26, 1979, were removed from within the confines of Biscayne National Park and were found by Gerald Klein within the territorial sea of the United States.

6. The United States owns in fee simple the land in which the remains of the vessel claimed by plaintiff lie.

7. The United States has known of the existence and approximate location of the subject 18th century shipwreck located within Legare Anchorage in Biscayne National Park since at least 1975 and probably as early as 1970.

8. Although the government was aware of the existence of the defendant wreck and had documented its approximate location as early as February, 1975, it did not physically locate the wreck until July 4, 1980.

9. The remains of the vessel claimed by plaintiff are objects of antiquity over 200 years old.

10. The remains of the vessel claimed by plaintiff are historic ruins revealing the remains of past human life and activities which are of archeological interest.

11. Before the filing of this action the United States did not know that Gerald Klein had removed artifacts from the wreck.

12. It is in the public interest that if artifacts are to be removed from the wreck the removal be conducted with scrupulous care.

13. The historic value of each artifact is enhanced by careful monitoring of archeological provenience, the exact location at which each item is found in terms of horizontal and vertical coordinates, the extent of burial, water depth and its spatial relationship to other items found.

14. Archeological provenience is not only important for the historical information that it provides, but it also adds to the value of the artifacts for donation or sale to interested buyers.

15. Gerald Klein neither applied for nor received a permit from the federal government or the State of Florida to excavate or remove artifacts or objects from the defendant wreck.

16. Before the filing of this action Gerald Klein did not notify the United States that he had removed artifacts from the wrecksite nor did he return those artifacts to the United States or its agents.

17. The United States had never initiated salvage activities on the defendant vessel before the commencement of this action.

18. The United States removed artifacts from the wreck after it was appointed custodian.

19. The State of Florida has voluntarily withdrawn from this action and has no right or title in the submerged lands in which the defendant wreck lies.

20. The artifacts removed from the wreck site by the United States are pres-

ently stored at the Southeast Archeological Survey Offices in Tallahassee, Florida.

## II. JURISDICTION

This Court has subject matter jurisdiction based on 28 U.S.C. §§ 1331,[3] 1333. The Court also has *in personam* jurisdiction over the parties [4] and *in rem* jurisdiction [5] to determine the rights of the parties in the vessel and its artifacts which are situated entirely within Legare Anchorage, Dade County, Florida, within the territorial district of this Court.

## III. CONCLUSIONS OF LAW

Within recent years, a number of cases have been filed in this district to determine title to and possession of various ancient shipwrecks abandoned off the coast of Florida. In most of these cases the wrecks have been situated in international waters, under no sovereign control, or within the territorial waters of a state. This case, however, is unlike any of its predecessors in that it concerns a wreck embedded in land owned in fee simple by the United States and administered and controlled by the national park system.[6]

### A. *Claim of Title*

█ In determining title to property abandoned at sea, the courts have rejected the traditional salvage law theory that the owner retains title and have instead applied the law of finds under the doctrine of "animus revertendi," the owner has no intention of returning.[7] Under the common law of finds, a finder who takes possession of lost or abandoned property and exercises dominion and control over it acquires title.[8] The plaintiff has claimed title to the abandoned wreck as a first finder who has reduced his find to possession. Under this theory, it would be the plaintiff's burden to demonstrate, as indicated above, that he had the power and intention to exercise exclusive dominion and control over the vessel and its artifacts. Although it is my opinion that the evidence is insufficient to support plaintiff's claim of exclusive possession, it is not necessary to reach this issue. The wreck that the plaintiff "found" in the late summer of 1978 was neither lost nor abandoned at that time.

█ The general rule in the law of finds is that the determination of the finder's right to abandoned property is unaffected by the ownership of the land on which the property is found. There are, however, two relevant exceptions: (1) when the property is embedded in the soil and (2) when the owner of the land has constructive possession of the property such that the property is not considered legally lost.[9] Under each

---

**3.** The United States has claimed the vessel and its artifacts on the basis of a number of federal statutes including, National Park Service Act, 16 U.S.C. § 1 *et seq.;* Biscayne National Monument Act, 16 U.S.C. § 450qq; Archeological Resources Protection Act, 16 U.S.C. § 470aa, *et seq.;* Antiquities Act of 1906, 16 U.S.C. § 431 *et seq.;* Abandoned Property Act, 40 U.S.C. § 310.

**4.** *Treasure Salvors v. Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330, 335 & n. 6 (5th Cir.1978) (*Treasure Salvors I*).

**5.** *Id.* at 333; *State of Florida, Dept. of State v. Treasure Salvors (Unidentified Wrecked and Abandoned Sailing Vessel),* 621 F.2d 1340. The government argued that this Court lacked *in rem* jurisdiction pursuant to 46 U.S.C. § 741 which states, "No vessel owned by the United States ... and no cargo owned ... by the United States ... shall, in view of the provision

herein made for a libel *in personam,* be subject to arrest or seizure by judicial process in the United States or its possession." *Id.* This statute would not seem to apply when the ownership of the vessel is at the center of the dispute.

**6.** *See* 16 U.S.C. § 450qq-3.

**7.** *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 408 F.Supp. 907, 909 (S.D.Fl.1976); *Treasure Salvors I* at 336-37.

**8.** *Treasure Salvors v. Unidentified Wrecked and Abandoned Sailing Vessel,* 640 F.2d 560, 571 (5th Cir.1981) (*Treasure Salvors III*); *Treasure Salvors I* at 337.

**9.** 36A C.J.S. *Finding Lost Goods* § 5c (1961); 1 AM JUR 2D *Abandoned, Lost Property* §§ 3, 4, 22 (1962).

of these exceptions the United States was the rightful owner of the vessel at the time the plaintiff discovered it.

### 1. Property Embedded in the Soil

It is undisputed that in 1973 the United States obtained title in fee simple from the State of Florida to the submerged lands known originally as Biscayne National Monument and later as Biscayne National Park.[10] This land, owned by the United States, is managed as part of the National Park System.[11] The vessel that is the subject of this litigation lies in Legare Anchorage within Biscayne National Park.

 The law of finds provides that "a person who finds property which is embedded in the soil, but which is not treasure trove,[12] acquires no title thereto, for the presumption is that the owner of the land on which the object is found has possession."[13] The Court heard uncontradicted testimony and viewed film indicating that the wreck was substantially buried in and firmly affixed to the land. Therefore, when the United States acquired title to the land in 1973, it also became owner of the wrecked vessel embedded in its soil.

### 2. Constructive Possession

 It is clear from the evidence that although the United States did not have actual physical possession of the wreck, it had constructive possession such that the property could not be considered legally lost and subject to a finder's claim.

[When an object] is found in a place such that the owner of the premises is considered in constructive possession or custody of it, even though he had no knowledge of it, and it is, therefore, not a lost article in the legal sense. . ., the owner of the premises where the [object] is found has the right to the possession of the article as against the finder.[14]

Constructive possession is generally defined as "knowingly having both the power and intention at a given time to exercise dominion or control over the property."[15]

### a. "Knowingly"

In February, 1975, three years before Gerald Klein's discovery, George R. Fischer, an underwater archeologist, prepared a Preliminary Archeological Assessment of Biscayne National Monument for the National Park Service.[16] The assessment listed forty-six locations of historic shipwrecks within the park with specific reference to an 18th century wreck within Legare Anchorage. This ship was tentatively identified as the *Nuestra Senora del Pupolo,* a vessel of the 1733 Spanish fleet. Archeologists have now re-identified it as an 18th century English ship, the *Fowey.* Although identification of archeological finds is always provisional and subject to re-evaluation, the parties tend to agree at this time that the abandoned wreck that is the subject of this dispute is, in fact, the *Fowey.*[17]

The true identification of the wreck, however, is irrelevant to the Court's finding that the United States *knew* an 18th century ship existed in Legare Anchorage as early as 1975, documented this fact in the Assessment and, far from abandoning the wreck, took steps in 1976 to have all wrecks within Biscayne National Monument, as listed in the Assessment, placed in the National Register of Historic Places.[18]

**10.** *See infra* note 2.

**11.** A 1970 Amendment to the National Park Service Act clarified that Congress intended the national park system to include both land and water areas. 16 U.S.C. § 1c(a).

**12.** Treasure trove is defined as gold, silver, or its paper representative. There is no evidence before the Court that gold or silver has been found at the wreck site.

**13.** 1 AM.JUR.2D *Abandoned, Lost Property* § 22 (1962).

**14.** 36A C.J.S. § 5c(1) (1961).

**15.** *United States v. Cousins,* 427 F.2d 382, 384 (9th Cir.1970).

**16.** *See* United States Exhibit 1.

**17.** The initial confusion as to the nationality of the ship was created by the presence of Spanish material at the wreck site, probably explained by the fact that the *Fowey* was known to be towing a captured Spanish vessel when it sank.

**18.** *See* United States Exhibit 4.

### b. "Power" and "Intention"

The United States clearly has the *power* to exercise dominion and control over the wreck pursuant to the Property Clause of the United States Constitution.[19] The Property Clause has been construed in *Kleppe v. New Mexico*[20] to give Congress complete power over public property:

> [T]he Clause in broad terms, gives Congress the power to determine what are 'needful' rules 'respecting' the public lands. And while the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, we have repeatedly observed that '[t]he power over the public land entrusted to Congress is without limitations.'[21]

Such an expansive reading of the Property Clause enabled the Court in *Kleppe* to uphold legislation regulating and protecting wildlife found on public lands. This plainly demonstrates that the power of the Property Clause will reach objects without title found on government land.

The *intention* of the government to exercise dominion and control over the vessel is evidenced by a number of federal statutes and regulations protecting objects found within national parks and objects found on public lands.

One of the stated purposes of the National Park Service Act is the conservation of historic objects for the enjoyment of future generations.[22] Toward that goal, the Secretary of the Interior promulgated the following regulation applicable to "all persons ... within the boundaries of any federally owned or controlled areas administered by the National Park Service.":[23]

The possession, destruction, injury, defacement, removal or disturbance in any manner of any artifact, relic, historic or prehistoric feature, or of any other public property of any kind is prohibited.[24]

The Antiquities Act of 1906[25] requires that persons going on public lands to examine or excavate archeological sites obtain permits.[26] The Act further requires that permits be issued only to qualified persons and that all objects gathered at the sites be permanently preserved in museums for the benefit of the public.[27] Failure to obtain such permission results in a fine, or imprisonment or both.[28]

The enforcement provision of the Antiquities Act was declared unconstitutionally vague by the Ninth Circuit in *United States v. Diaz*.[29] The plaintiff, therefore, argues that the Act cannot be used to support the government's claim to the wreck. Since we are not here to determine whether penalties can be enforced against the plaintiff, the vagueness issue as it arose in the *Diaz* Court is irrelevant.[30] We are concerned only with deciding whether the United States had the intent to exercise dominion and control over the wreck. The Antiquities Act unmistakably registers such intent as does its successor legislation, the Archeological Resources Protection Act (ARPA).[31]

The enactment of ARPA indicates a continuing interest by the government in protecting its archeological resources from commercial excavation and pillage. ARPA provides that objects excavated or retrieved from public lands pursuant to an authorized permit are to remain the property of the United States.[32] It also re-

---

**19.** *See* U.S. Const. art. IV, § 3, cl. 2.

**20.** 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976).

**21.** *Id.* at 539, 96 S.Ct. at 2291 (citing *United States v. San Francisco,* 310 U.S. 16, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1939)).

**22.** 16 U.S.C. § 1.

**23.** 36 C.F.R. § 1.1(a).

**24.** 36 C.F.R. § 2.20(a)(1).

**25.** 16 U.S.C. § 431 *et seq.*

**26.** 16 U.S.C. § 432.

**27.** *Id.*

**28.** 16 U.S.C. § 433.

**29.** 499 F.2d 113 (9th Cir.1974).

**30.** The Court notes, however, that in *United States v. Smyer,* 596 F.2d 939, 941 (10th Cir. 1979) the Tenth Circuit found no constitutional infirmity in the Act.

**31.** 16 U.S.C. § 470aa, *et seq.*

**32.** 16 U.S.C. § 470cc(b)(3).

quires that any objects taken from archeological sites be preserved in a museum or other suitable institution for the public benefit.[33]

It is without question that Congress had the power to exercise dominion and control over the wreck, and the statutory evidence is overwhelming that it had the intent. It is clear that the United States was in constructive possession of the wreck at the time the plaintiff discovered it embedded in public land.

### B. Salvage Claim

Having determined under the common law of finds that the Plaintiff has no right or title to the subject vessel, I now address plaintiff's alternative claim for a liberal salvage award. A valid salvage claim must show the following elements:

1. A maritime peril from which the ship or other property could not have been rescued without the salvor's assistance.

2. A voluntary act by the salvor—that is, he must be under no official or legal duty to render the assistance.

3. Success in saving, or in helping to save, at least a part of the property at risk.[34]

The Court has already found that the government was in constructive possession of the wreck at the time the plaintiff discovered it. The law of salvage provides that "so long as the owner, or his agent, remains in possession, he is entitled to refuse unwelcome offers of salvage." [35] Further, it has been stated in a case originating in this District that "there can be no suggestion that federal admiralty procedures sanction salvaging methods which fail to safeguard items and the invaluable archeological information associated with the artifacts salved." [36]

The Preliminary Archeological Assessment and the Nomination Form for the National Register of Historic Places contemplated the examination and observation of the site in its natural environment, *in situ,* and the recovery of surface items by archeologically approved procedures. Plaintiff was not a trained, qualified archeologist, and his salvage efforts employed no procedures to protect or preserve the archeological and historical significance of the artifacts he removed from the site. Unfortunately, the plaintiff's unauthorized disturbance of one of the oldest shipwrecks in the Park and his unscientific removal of the artifacts did more to create a marine peril than to prevent one. It is my opinion that the plaintiff satisfied only one element of a valid salvage claim in that his actions were voluntary. I must therefore reject the plaintiff's request for a salvage award.

Having determined that all relief sought by the plaintiff shall be denied, the Clerk shall enter judgment under Fed.R.Civ.P. 58.

---

**33.** *Id.*

**34.** G. GILMORE & C. BLACK, JR., THE LAW OF ADMIRALTY 534–35 (1975).

**35.** *Id.* at 536.

**36.** *Cobb Coin Co. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 525 F.Supp. 186, 208 (S.D.Fl.1981).