**Frank CHANCE, Paul Chance and David Topper, Plaintiffs,**

v.

**CERTAIN ARTIFACTS FOUND AND SALVAGED FROM THE NASHVILLE a/k/a the Rattlesnake, Her Engines, Boilers, Tackle, etc., in rem., Defendant,**

**State of Georgia, Claimant.**

**No. CV483–391.**

United States District Court, S.D. Georgia, Savannah Division.

Aug. 16, 1984.

Harold B. Yellin, Savannah, Ga., for plaintiffs.

Robert S. Bomar, Sr. Asst. Atty. Gen., Dept. of Law, State of Georgia, Atlanta, Ga., Gustave R. Dubus, III, Savannah, Ga., for defendant.

## ORDER

EDENFIELD, District Judge.

Plaintiffs brought this admiralty action to determine their rights, if any, to artifacts salvaged from a sunken ship located on state property at the bottom of the Ogeechee River. The State of Georgia has intervened as claimant.

### I. *Background*

THE NASHVILLE, a side-wheel steamer, was built in 1853. The Confederate government seized THE NASHVILLE during the Civil War and deployed the vessel to destroy northern ships. Subsequently, private investors purchased THE NASHVILLE and rechristened her THE RATTLESNAKE. It was THE RATTLESNAKE's mission to raid and plunder Union merchant ships so that her owners could sell the captured ships and cargo. On February 28, 1863, THE RATTLESNAKE ran aground at Seven Mile Bend in the Ogeechee River just above Fort McAllister. A Union ship, the USS MONTAUK, steamed up the Ogeechee River and fired on THE RATTLESNAKE; the vessel exploded and sank. It came to rest on the sand bar below.

For over a century, the vessel has remained in the location where it ran aground in 1863. The evidence submitted at trial shows that THE NASHVILLE is firmly affixed to the river bottom. The parties do not dispute the fact that the vessel rests on State property. In 1974, Bill Kinsey sought to excavate THE NASHVILLE. In his report, *Diving: The CSS NASHVILLE*, Kinsey wrote, "[t]he first thing observed was the large buildup of sand on the [up]river side ..." He further noted that in one location on the upriver side "only a few inches of the ribs" were visible. This characterization is consistent with the testimony offered at trial. The extent to which the hull is exposed varies; the downriver portions are much more exposed than the upriver portions. Towards the midship section the river bottom has crept over the vessel, filling it with approximately five to eight feet of sand.

Plaintiffs applied for a state permit to excavate THE NASHVILLE. The state denied that request. Nevertheless, plaintiffs began diving operations in 1979 and since that time have recovered various artifacts from the wreckage. The Georgia Department of Natural Resources (DNR) was unaware of plaintiffs' diving operations until August, 1983. Upon learning of the plaintiffs' activities, the DNR immediately ordered plaintiffs to cease diving and to turn over all recovered artifacts.

Plaintiffs brought this action in September, 1983, seeking title to the artifacts or, alternatively, a salvage award. The state has consented to this Court's adjudication of title to the artifacts. However, it invokes an Eleventh Amendment immunity defense to plaintiffs' claim for a salvage award.

### II. *Conclusion*

#### A. *Jurisdiction*

This Court has jurisdiction pursuant to 28 U.S.C. § 1333. The United States Supreme Court has recently held that once

a state asserts a colorable claim to property, a federal court does not have the authority to adjudicate the state's interest in that property without the state's consent. *Florida Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 682, 102 S.Ct. 3304, 3313, 73 L.Ed.2d 1057 (1982). That principle does not pose a bar to the instant proceedings, however, because the state has consented to this action.

### B. *Maritime Law of Finds or Salvage*

The first issue this Court must resolve is whether to apply the maritime law of finds or salvage. The law of finds and the law of salvage are not always distinguished by admiralty courts. In the instant case, however, the distinctions are noteworthy.

#### 1. *Salvage Law*

■ The emphasis in maritime salvage law is on the *salvage* of imperiled property. The doctrine of salvage assumes title to the property rests in some individual. Thus, even though a vessel is abandoned without the hope of recovery or return, the title of the vessel remains in her owner. 3A Benedict at 11–1 (1983). The salvor of property has a right to an award or a lien against the property. 3A Benedict at 10–1 (1983). The property is sold by the court and the proceeds of the sale are used to satisfy the salvor's award. The sale is also a means of clearing title to the property or a means of giving the owner the opportunity to regain possession of the property. *See Wiggins v. 1100 Tons More or Less, of Italian Marble*, 186 F.Supp. 452, 457 (E.D.Va.1960). Any stranded, sunken, or otherwise imperiled vessel is the proper subject of a salvage award. 3A Benedict at 3–16 (1983).

#### 2. *The Law of Finds*

■ Modern courts, however, have rejected the salvage law theory that title to property can never be lost. They have instead applied the law of finds under the doctrine of "animus revertendi" (the owner has no intention of returning). *Klien v. Unident., Wrecked & Aban. Sailing Vessel*, 568 F.Supp. 1562, 1565 (S.D.Fla.1983).

The property is considered the equivalent of a plant or a fish. *Hener v. United States*, 525 F.Supp. 350, 354 (S.D.N.Y. 1981). Under the law of finds, the inference of abandonment may arise from lapse of time and nonuse of the property. *Wiggins*, 186 F.Supp. at 456; *see also Erickson v. Sinykin*, 223 Minn. 232, 26 N.W.2d 172 (1947), 170 A.L.R. 697. Unlike salvors who are granted a monetary award for their efforts, a finder acquires title to the salvage property. Since THE NASHVILLE has rested at the bottom of the Ogeechee, unclaimed by its owner since 1863, this Court concludes that the law of finds applies.

#### a) *Embeddedness*

■ Under general finds principles, it is well settled that in a suit between competing salvors the first finder to take possession of lost or abandoned property with the intention to exercise control over it acquires title. *Klien v. Unident., Wrecked & Aban. Sailing Vessel*, 568 F.Supp. 1562, 1565 (S.D.Fla.1983); *see also Rickard v. Pringle*, 293 F.Supp. 981 (S.D.N.Y.1968); *Brady v. S.S. African Queen*, 179 F.Supp. 321 (E.D.Va.1960); *Wiggins v. 1100 Tons, More Or Less, Of Italian Marble*, 186 F.Supp. 452 (E.D.Va.1960); *Eads v. Brazelton*, 22 Ark. 499 (1861). In the instant case, however, the state does not assert a claim as a competing salvor; rather, the state maintains that under the "embeddedness" exception to the law of finds, (*i.e.*, because THE NASHVILLE is embedded on state property), title to the vessel rests with the state.

In *Klien v. Unident., Wrecked & Aban. Sailing Vessel*, 568 F.Supp. 1562, 1565 (S.D.Fla.1983), the court confronted a situation similar to that in the instant case. In *Klien*, an action was brought by an alleged "finder" for title to an abandoned shipwreck; alternatively, plaintiffs asserted a salvage claim. *Id.* at 1564. The ship was located on United States property in Biscayne National Park. The United States was aware of the vessel's existence and its approximate location since at least 1975.

*Id.* The plaintiff discovered the actual location of the ship in 1978; the United States discovered it in 1980. *Id.*

In resolving the title dispute between the United States and the alleged finders the *Klien* court applied the common law of finds. According to Judge Atkins, "[t]he general rule in the law of finds is that the determination of the finder's right to abandoned property is unaffected by the ownership of the land on which the property is found." *Id.* at 1565. When personalty is found embedded in land however, title to that personalty rests with the owner of the land. *Id.* at 1565, citing 36A C.J.S. *Finding Lost Goods* § 5c (1961); 1 Am Jur 2d *Abandoned, Lost Property* §§ 3, 4, 22 (1962); *see also Groover v. Tippins,* 51 Ga.App. 47, 179 S.E. 634 (1935). The *Klien* court found that the vessel was embedded in land owned in fee simple by the United States and thus concluded that title to the vessel properly rests with the United States.

The *Klien* court next considered whether plaintiff was nevertheless entitled to an award for his salvage efforts. Because the plaintiff failed to satisfy all the requirements for a salvage award, the court denied his claim. Thus, under *Klien* and the common law of finds, the State of Georgia must show that the vessel is "embedded in or attached to" the river bottom in order to assert a valid claim for title. *Klien,* 568 F.Supp. at 1566; *see also,* 36A C.J.S. Finding Lost Goods § 5 (1961).

At trial, the parties disputed whether THE NASHVILLE was actually "embedded" in the river bottom. To a great extent, plaintiffs relied on the fact that there is a deep crevice underneath the stern to support their conclusion that the wreck is not embedded. Plaintiffs seemed to suggest that the vessel must be totally buried in order to be deemed "embedded." It is true that many of the cases employing the embeddedness exception concern personalty actually buried in the land. *See, e.g., Klien,* 568 F.Supp. 1562, 1565 (S.D.Fla. 1983); *Favorite v. Miller,* 176 Conn. 310, 407 A.2d 974 (1978); *Schley v. Couch,* 155

Tex. 195, 284 S.W.2d 333 (1955); *Burdick v. Chesebrough,* 88 N.Y.S. 13, 94 App.Div. 532 (1904); *Goodard v. Winchell,* 86 Iowa 71, 52 N.W. 1124 (1892); *see also,* 170 A.L.R. 708. However, plaintiffs have not cited nor has this Court found any case which requires that the property be totally buried in order to satisfy the embeddedness requirement. In fact, case precedent is to the contrary.

In *Allred v. Biegel,* 240 Mo.App. 818; 219 S.W.2d 665 (1949), for example, swimmers in the Charition River discovered what they first thought was a log. However, further investigation revealed that they had found an old Indian canoe. "When found, about one-third of the canoe was embedded in the river bank, from 15–25 feet below the surface of the land. It extended about six inches above the water for a distance of a few feet, and the remainder was submerged in the water. In order to remove it the soil around the embedded portion was excavated, and then it was pulled out with the aid of a tractor and a block and tackle." *Id.* at 666. The court found that the canoe was embedded in the soil and concluded that title to the personalty properly belonged to the owner of the locus in qou. *Id.* at 666. The court reasoned:

> The leading case is on all fours with the case at bar. It is the English case of *Elwes v. Briggs Gas Company,* 33 Ch. 562, where an ancient ship, some 2,000 years old, hollowed out of a single oak log and retaining its character of wood (not fossilized), was discovered, embedded in the soil, by the lessee of the land, while lawfully excavating thereon. Chitty, J., held that whether the ship was to be regarded as mineral, or as a part of the realty under the maxim "Quicquid plantatur" [whatever is affixed to the soil belongs to the soil] or "fixatur solo, solo, cedit," or merely as a chattel embedded in the soil, its existence completely unknown to the owner of the land, the title thereto was in the owner of the land. It was said that the original owners were long since dead, that it is incon-

ceivable that their title could be established, and that the owner of the land claimed not only the surface thereof but everything within the soil, to the center of the earth including the ship that was embedded therein.

*Id.* at 666.

██ At trial, plaintiffs' witness, Howard Tower, testified as an expert diver. Tower had conducted diving operations on THE NASHVILLE independent of and prior to the instant action. Tower is also a journalist. On cross examination, he testified that both journalism and archeology require a great deal of accuracy. Although Tower was unable at trial to recall what portions of the hull were buried, in an article written for the August, 1979 issue of *Treasure Magazine* he wrote, "[f]rom this exploratory dive I learned that two-thirds of THE RATTLESNAKE's hull is buried in the sandbar." In describing the embeddedness of THE NASHVILLE's artifacts he wrote the relics are "sealed and beyond our grasp under tons of sand." On cross, Frank Chance testified that a large portion of the hull is intact. Plaintiffs testified further that an airlift was required to remove sand for the discovery of artifacts found in the engine room of the vessel. Under the *Allred* rationale, the fact that a portion of THE NASHVILLE stern is not touching the river bottom is insufficient to preclude this Court's finding that the vessel is "embedded" in state land.

The court's decision in *Ferguson v. Ray*, 44 Or. 557, 77 P. 600 (1904) further supports this Court's conclusion that THE NASHVILLE is embedded in the river bottom. In *Furguson*, plaintiff was leasing the premises from the defendant owner. One afternoon while chopping wood, the plaintiff noticed a rich specimen of gold-bearing quartz lying on top of the ground. Upon scraping the leaves away plaintiff found one or two other small pieces "on top, or almost on top of the ground, sticking through the ground." *Id.* at 601. By digging through the surface of the ground, plaintiff discovered more quartz extending to a depth of approximately ten to twelve

inches. In all, plaintiff recovered specimens of quartz weighing about seventeen and one-half pounds. The *Furguson* court noted that, "the possession of the land carries with it in general, by our law, possession of *everything which is attached to or under that land,* and in absence of better title elsewhere, the right to possess it also." (Emphasis added) 77 P. at 603. The court awarded the owner of the property title to the quartz. In the instant case, therefore, even those artifacts found resting in "loose surface soil" satisfy the embeddedness requirement as anticipated by common law.

Finally, in *Bishop v. Ellsworth*, 91 Ill. App.2d 386; 234 N.E.2d 49 (1968), three small boys, while playing in a salvage yard without the owner's permission, discovered a bottle "partially imbedded in the loose earth on top of a landfill." *Id.* at 50. The bottle contained $12,590. The lower court dismissed the plaintiff owner's action for possession of the money because the complaint failed to state a claim. The plaintiff's request for leave to amend was denied and plaintiff appealed that ruling. On appeal, the court reversed the lower court decision reasoning:

There is a presumption that the owner or occupant of land or premises has custody of property found on it or actually imbedded in the land. [cits] The ownership or possession of the locus in quo is related to the right to possession of property discovered thereon or imbedded therein.... It would also appear that if the discoverer is a trespasser such trespasser can have no claim to possession of such property even if it might otherwise be considered lost. [cit]

██ The *Allred, Furguson* and *Bishop* cases all show that property need not be totally buried to satisfy the embeddedness requirement. What is affixed to the land belongs to the owner of that land. The *Furguson* case in particular suggests that where a portion of the find is firmly affixed to the land, then even though other portions of it lie in loose surface soil, title to the entire find nevertheless rests with

the land owner. In the instant case, while testimony concerning the amount of sand coverage is important, perhaps the degree of embeddedness is best illuminated by the fact that THE NASHVILLE has remained in its current location for over 120 years. Throughout that period it has held its ground despite strong tidal currents. Violent storms which have swept across the river in the past century have failed to wrest the vessel from the sand that firmly grasps its hull. Not even dynamite operations conducted by the state in the 1960's were successful in dislodging the sunken vessel.[1] While the evidence may be unclear as to whether the hull is exposed twelve feet in one area, or only one foot in another, the evidence does show that the vessel is firmly attached to the river bottom.

██ This Court's conclusion is also supported by policy considerations underlying the embeddedness requirement. First, courts reason that a trespasser should not benefit from his wrongdoing. *See, e.g., Favorite v. Miller,* 176 Conn. 310; 407 A.2d 974 (1978). Second, courts seek to protect against the spoil and waste of the owner's property interest. *Elwes v. Briggs Gas Co.,* 33 Chancery Division English Law Reports, 562. Thus, in *Elwes,* noted above, Judge Chitty explained that:

> [t]he chattel was vested in the plaintiff for the following reasons: Being entitled to the inheritance, and in lawful possession, he was in possession of the ground; not merely of the surface, but of everything that lay beneath the surface down to the center of the earth; and consequently in possession of the boat * * * The boat was embedded in the land. A mere trespasser could not have taken possession of it. He could only have come at it by further acts of trespass involving spoil and waste of inheritance. The plaintiff then being in possession of

the chattel, it follows then that the property in the chattel was vested in him."

Similarly, in the instant case, the plaintiffs' diving has involved continuous acts of trespass. Further, their use of an airlift resulted in the type of waste anticipated by the *Elwes* ruling.

Although it may have been plaintiffs' love of history and their desire to share the precious NASHVILLE relics with the public that inspired their efforts to excavate THE NASHVILLE, under finds principles, their good intentions are not sufficient to bring their actions within the ambit of the law. In *Favorite v. Miller,* 176 Conn. 310; 407 A.2d 974 (1978), the court considered the rights of a defendant who knowingly trespassed upon the plaintiff's land to recover a piece of the historic statute of King George III. With the aid of a metal detector the defendant located the relic which was found buried ten inches beneath the surface of plaintiff's soil. At trial, defendant argued that because his efforts led to the discovery of an artifact of great historical value, his actions should be encouraged and therefore rewarded. In response to this assertion the *Favorite* court noted:

> [E]ven if we assume his motive to be that of historical research alone, that fact will not justify his entering upon the property of another without permission. It is unquestioned that in today's world even archeologists must obtain permission from owners of property and the government of the country involved before they can conduct their explorations.... On a more familiar level, backpackers and hikers must often obtain permits before being allowed access to certain of our national parks and forests, even though that land is public and not private.

The *Favorite* court awarded the owner of the realty title to the *res.*

In the instant case, despite plaintiffs' testimony to the contrary, their application to the state for permit to excavate THE

---

**1.** As noted by Rudyard Kipling in *City of the Dreadful Night,*

> When a ship sinks in mud or quicksand she regularly digs her own grave and wriggles herself into it deeper and deeper till she reaches moderately solid stuff. Then she sticks.

NASHVILLE suggests that plaintiffs were aware that the land belonged to the state. However, whether they in fact knew that title to the ship was in the state is irrelevant to the disposition of this case. The evidence presented at trial reveals that the ship is "embedded in or attached to" the bottom of the Ogeechee River. As a result, title to the vessel properly rests with the state.

## C. Plaintiffs' Salvage Award Claim

▮▮▮▮▮ Although this Court concludes that title to the res properly rests with the state, the Klien rationale permits consideration of whether plaintiffs have asserted a valid claim for a salvage award. In the instant case, however, plaintiffs salvage claim must be denied for at least two reasons. First, the state asserts an Eleventh Amendment defense with respect to this claim. As noted earlier, in Treasure Salvors, 458 U.S. at 684, 102 S.Ct. at 3314, the Supreme Court held that "[a] suit may not be maintained directly against the State itself, ... unless the State has waived its sovereign immunity." Plaintiffs maintain that the Eleventh Amendment does not bar their salvage claim because the award would not constitute a money judgment against the state. As argued by plaintiffs in their brief, "[n]ormally salvaged items are sold to satisfy the salvor's judgment. However, where the 'proceeds of the salvor's find are items uniquely and intrinsically valuable beyond their monetary worth, an award in specie is more appropriate.... [Since] any recovery in this case would be in the form of the objects which the Plaintiffs have brought before the Court; there would be no money judgment to be expended from the State's Treasury.'" Plaintiff's Brief at 1 quoting from Cobb Coin I, 525 F.Supp. 186 at 198 (S.D. Fla.1981).

The in specie award noted by the plaintiffs was first advanced in Cobb Coin I, 525 F.Supp. at 198. However, the Fifth Circuit has since rejected this approach in Platoro Ltd. Inc. v. Unidentified Remains, Etc., 695 F.2d 893, 904 (5th Cir. 1983) wherein the court stated: "[w]e cannot find a case where the salvage award was expressed in terms of the res rather than in dollars, except where the salvage award was made alternatively with an award of title to the res under the law of finds." The Fifth Circuit therefore vacated the district court's award of the res and remanded the case for a determination of a dollar amount not to exceed the value of the res. This Court likewise concludes that only under the law of finds may title to the res be granted. This Court has discovered no case in which a court has awarded title to the res as a reward in a salvage law claim. In fact, to do so would be violative of the underlying salvage law principles since salvage law assumes that title to the personalty remains in its owner. Therefore, this Court declines to accept the in specie award as a valid award in a salvage action.

Further, even if consideration of plaintiffs' salvage law claim were warranted, plaintiffs have nevertheless failed to fulfill all the elements of a valid salvage claim. To state such a claim, plaintiffs must prove:

(1) Their services were voluntary.

(2) They successfully salvaged the articles.

(3) The artifacts are in marine peril. See e.g., Klien, 568 F.Supp. at 1568. Testimony at trial revealed that plaintiffs' salvage efforts created a greater peril than that which previously existed on the river bottom. Dr. Wright, Associate Professor of Anthropology at Valdosta State College, explained that when a vessel sinks, "[t]here is an initial state of rapid deterioration. It [the vessel] adjusts to the environment in which it is, and then it reaches a state of equilibrium. The deterioration continues at a much, much slower rate. It will remain in a state of equilibrium, or approximate equilibrium, until it is once again disturbed." (Tr. at 11). See also Arnold III, J.B. & Wendorf, F., Treasure Hunting: Fact and Fiction, (1983) at 5. Disturbance of the equilibrium by taking artifacts from the site, for example, exposes the timbers to

new environmental stimuli, which, if allowed to continue, could increase the deterioration process. (Tr. 11, 12). Although experts at trial could not agree on whether THE NASHVILLE was in a state of equilibrium, this Court credits Dr. Wright's testimony that equilibrium does in fact exist.

Furthermore, plaintiffs have not taken adequate steps to ensure conservation of the artifacts. While some artifacts have been placed in holding bins, the water in these bins has remained unchanged, which is detrimental to the artifacts. Further, uncontradicted testimony revealed that many items not currently stored in holding cells are piled in the plaintiffs' backyard where they are subject to random and deleterious exposure to the various elements. In other words, the artifacts are now subject to a much greater rate of deterioration than if they had remained on the river bottom. (Tr. at 45). In light of these facts, plaintiffs' claim for a salvage award must be denied.

After considering the testimony of all the witnesses and after examining all the evidence submitted, this Court concludes that THE NASHVILLE is embedded in the Ogeechee River bottom. Title to the vessel therefore rests with the state. Under the Eleventh Amendment, and alternatively due to plaintiffs' failure to prove all the elements required to assert a valid salvage claim, plaintiffs' claim for a salvage award must be denied.

The Clerk is directed to enter a judgment on all issues for the State of Georgia.