**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Arthur J. GERBER, Defendant–
Appellant.**

No. 92–2741.

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1993.

Decided July 20, 1993.

Larry A. Mackey (argued), Scott C. Newman, Asst. U.S. Attys., Indianapolis, IN, for U.S.

Harvey M. Silets (argued), Kenneth M. Kliebard, Katten, Muchin & Zavis, Chicago, IL, Jeffery L. Lantz, Evansville, IN, for Arthur J. Gerber.

Steven R. Dowell, Newport, KY, for Society for Documentation of Prehistoric America amicus curiae and Three Rivers Archaeological Soc., amicus curiae.

Steven R. Dowell, Newport, KY, E. Dean Singleton, Owensville, IN, C. Dean Higginbotham, Princeton, IN, for Indiana Archaeological Soc., amicus curiae.

E. Dean Singleton, Owensville, IN, C. Dean Higginbotham, Princeton, IN, for Council for Conservation of Indiana Archaeology, amicus curiae, Wabash Valley Archaeological Soc., amicus curiae, Society of American Archaeology, amicus curiae, Society of Professional Archaeologists, amicus curiae, Illinois Archaeological Survey, amicus curiae, Kentucky Organization of Professional Archaeologists, amicus curiae, Archaeological Society of Indianapolis, amicus curiae and National Trust for Historic Preservation in the U.S., amicus curiae.

Before POSNER, RIPPLE, and ROVNER, Circuit Judges.

POSNER, Circuit Judge.

Arthur Joseph Gerber pleaded guilty to misdemeanor violations of the Archaeological Resources Protection Act of 1979, 16 U.S.C. §§ 470aa *et seq.*, and was sentenced to twelve months in prison, reserving however his right to appeal on the ground that the Act is inapplicable to his offense. What he had done was to transport in interstate commerce Indian artifacts * that he had stolen from a burial mound on privately owned land in violation of Indiana's criminal laws of trespass and conversion. The section of the Archaeological Resources Protection Act under which he was convicted provides that "no person may sell, purchase, exchange, transport, receive, or offer to sell, purchase, or exchange, in interstate or foreign commerce, any archaeological resource excavated, removed, sold, purchased, exchanged, transported, or received in violation of any provision, rule, regulation, ordinance, or permit in effect under State or local law." 16 U.S.C. § 470ee(c). Gerber argues that despite the references in this section to state and local law, the Act is inapplicable to archaeological objects removed from lands not owned either by the federal government or by Indian tribes. His back-up argument is that the provisions, rules, regulations, and so forth of state or local law to which the Act refers are limited to provisions expressly protecting archaeological objects or sites, as distinct from laws of general application such as those forbidding trespass and theft. The issues are novel because this is the first prosecution under the Act of someone who trafficked in archaeological objects removed from lands other than either federal or Indian lands.

---

\* We are mindful that "Native American" is the term preferred by most members of the American Indian community. Since, however, the statute and both of the parties use the term "Indian," we have decided to do likewise.

More than fifteen hundred years ago in the American midwest Indians built a series of large earthen mounds over prepared mound floors containing human remains plus numerous ceremonial artifacts and grave goods made of silver, copper, wood, cloth, leather, obsidian, flint, mica, quartz, pearl, shells, and drilled, carved, or inlaid human and bear teeth. This mound culture, the product of a civilization that included the beginnings of settled agriculture, an elaborate ceremonialism, and far-flung trading networks, has been dubbed the "Hopewell phenomenon." N'omi B. Greber & Katharine C. Ruhl, *The Hopewell Site: A Contemporary Analysis Based on the Work of Charles C. Willoughby* (1989); Warren K. Moorehead, *The Hopewell Mound Group of Ohio* (Field Museum of Natural History, Publication No. 211, 1922). In 1985 farmers sold General Electric a piece of untillable land in southwestern Indiana adjacent to one of its factories. The land contained a prominent knob on top of a ridge. Unbeknownst to anyone this knob was a Hopewell burial mound some 400 feet long, 175 feet wide, and 20 feet high. The mound and its contents (which included two human skeletons) were intact—even the perishable materials such as wood and leather artifacts were well preserved—and when discovered it would prove to be one of the five largest Hopewell burial mounds known.

A highway was planned to run through the ridge on which the knob was located. In the course of construction, in 1988, earth was removed from the knob to stabilize the roadbed. Workmen engaged in this removal discovered in the knob curious objects—turtleback-shaped rocks—which they showed to a heavy-equipment operator on the project, named Bill Way, who happened to be a collector of Indian artifacts. Recognizing the significance of the find, Way nosed his bulldozer into the knob and quickly discovered hundreds of artifacts, including copper axeheads, inlaid bear canines, and tooled leather. He loaded these items into his pickup truck and covered up the excavation he had made. An acquaintance put him in touch with Arthur Joseph Gerber, a well-known collector of Indian artifacts and promoter of annual Indian "relic shows." Gerber paid Way $6,000 for the artifacts and for revealing to Gerber the location of the mound. Way took Gerber to the site the same night, encountering other people digging for Indian artifacts. Gerber returned to the site several more times, excavating and removing hundreds of additional artifacts, including silver earspools, copper axeheads, pieces of worked leather, and rare silver musical instruments, some with the original reeds preserved. On Gerber's last visit to the site he was detected by a General Electric security guard and ejected. Shortly afterward Gerber sold some of the artifacts at his annual "Indian Relic Show of Shows" in Kentucky. He acknowledges that in entering upon General Electric's land without the company's permission and in removing, again without its permission, Indian artifacts buried there, he committed criminal trespass and conversion in violation of Indiana law. He also acknowledges having transported some of the stolen artifacts in interstate commerce.

The preamble of the Archaeological Resources Protection Act of 1979 states that "archaeological resources on public lands [defined elsewhere in the Act as *federal* public lands] and Indian lands are an accessible and irreplaceable part of the Nation's heritage" and that the purpose of the Act is "to secure, for the present and future benefit of the American people, the protection of archaeological resources and sites which are on public lands and Indian lands." 16 U.S.C. §§ 470aa(a)(1), (b). Consistent with this preamble, most of the Act is given over to the regulation, in the form of civil and criminal penalties, permit requirements, forfeiture provisions, and other regulatory devices, of archaeological activities *on federal and Indian lands*. The criminal penalties are for archaeological activities conducted on those lands without a permit and for trafficking in archaeological objects that have been removed from them in violation either of the Act's permit requirements or of any other federal law. §§ 470ee(a), (b). Gerber did not remove Indian artifacts from federal or Indian lands, however, and was therefore prosecuted under the third criminal provision (§ 470ee(c), quoted earlier), which is not in terms limited to such lands.

The omission of any reference in subsection (c) to federal and Indian lands was, Gerber argues, inadvertent. Not only the preamble of the Act, but its legislative history, shows that all that Congress was concerned with was protecting archaeological sites and objects on federal and Indian lands. This is indeed all that the preamble mentions; and a principal sponsor of the Act said that "it does not affect any lands other than the public lands of the United States and [Indian] lands." 125 Cong.Rec. 17,394 (1979) (remarks of Congressman Udall). The legislative history contains no reference to archaeological sites or objects on state or private lands. The Act superseded the Antiquities Act of 1906, 16 U.S.C. §§ 431–33, which had been expressly limited to federal lands. And if the Act applies to nonfederal, non-Indian lands, its provisions are at once over-inclusive and underinclusive: overinclusive because the Act authorizes the federal court in which a defendant is prosecuted to order, in its discretion, the forfeiture of the archaeological objects involved in the violation *to the United States* (unless they were removed from Indian lands), §§ 470gg(b), (c); underinclusive because the provisions authorizing civil penalties and the payment of rewards to informers *out of fines collected in criminal prosecutions under the Act* are administered by officials who lack jurisdiction over nonfederal, non-Indian lands. §§ 470bb(2), 470ff, 470gg(a). (The artifacts stolen by Gerber were recovered and are being held by the United States as evidence in this case, but they have not been ordered forfeited.) Most scholarly commentators on the Act assume that it is limited to federal and Indian lands. E.g., Kristine Olson Rogers, "Visigoths Revisited: The Prosecution of Archaeological Resource Thieves, Traffickers, and Vandals," 2 *J. Environmental Law & Litigation* 47, 72 (1987). Gerber reminds us of the rule of lenity in interpreting criminal statutes and of the implied constitutional prohibition against excessively vague criminal statutes. He adds that subsection (c) of section 470ee would not be a nullity if the Act were held to be limited to sites and objects on federal and Indian lands. A number of state laws prohibit trafficking in stolen Indian artifacts regardless of their origin, and it has not been suggested that these statutes are preempted by the federal Act even with respect to artifacts stolen from federal or Indian lands. A person who trafficked in Indian artifacts in violation of state law would be subject to federal prosecution only under subsection (c) even if the artifacts had been removed from federal or Indian lands, if the removal happened not to violate federal law.

We are not persuaded by these arguments. That the statute, the scholarly commentary, and the legislative history are all focused on federal and Indian lands may simply reflect the fact that the vast majority of Indian sites—and virtually all archaeological sites in the Western Hemisphere are Indian—are located either in Indian reservations or on the vast federal public lands of the West. Subsection (c) appears to be a catch-all provision designed to back up state and local laws protecting archaeological sites and objects wherever located. It resembles the Mann Act, the Lindbergh Law, the Hobbs Act, and a host of other federal statutes that affix federal criminal penalties to state crimes that, when committed in interstate commerce, are difficult for individual states to punish or prevent because coordinating the law enforcement efforts of different states is difficult. The reference to interstate commerce would be superfluous if the subsection were limited to artifacts taken from federal or Indian lands, since either source would establish federal jurisdiction with no need to require proof that the artifacts were transported in interstate commerce. Probably the subsection was added as an afterthought, so one is not surprised that it does not jibe perfectly with the surrounding provisions; but that does not make it invalid, and it certainly is not vague. And we cannot see how the purposes of the Act would be undermined by our giving subsection (c) the interpretation that its words invite.

An amicus brief filed by several associations of amateur archaeologists claims that such an interpretation will infringe their liberty to seek to enlarge archaeological knowledge by excavating private lands. But there is no right to go upon another person's land, without his permission, to look for valuable objects buried in the land and take them if

you find them. At common law General Electric would have been the owner of the mound and its contents regardless of the fact that it was unaware of them. *Elwes v. Brigg Gas Co.*, 33 Ch. D. 562 (1886); *South Staffordshire Water Co. v. Sharman*, [1896] 2 Q.B. 44. The modern American law is the same. *Klein v. Unidentified Wrecked & Abandoned Sailing Vessel*, 758 F.2d 1511, 1514 (11th Cir.1985); *Ritz v. Selma United Methodist Church*, 467 N.W.2d 266, 269 (Ia. 1991); *Favorite v. Miller*, 176 Conn. 310, 407 A.2d 974, 978 (1978); *Bishop v. Ellsworth*, 91 Ill.App.2d 386, 234 N.E.2d 49 (1968); *Allred v. Biegel*, 240 Mo.App. 818, 219 S.W.2d 665 (1949); *Chance v. Certain Artifacts Found & Salvaged*, 606 F.Supp. 801, 806–08 (S.D.Ga. 1984). *Allred* actually involved an Indian artifact. Although we have found no Indiana cases, we are given no reason to suppose that the Indiana courts would adopt a different rule. It would make no difference if they would. Whatever the rightful ownership of the mound and its contents under current American law, no one suggests that Way or Gerber obtained any rights to the artifacts in question. No doubt, theft is at the root of many titles; and priceless archaeological artifacts obtained in violation of local law are to be found in reputable museums all over the world. But it is almost inconceivable that Congress would have wanted to encourage amateur archaeologists to violate state laws in order to amass valuable collections of Indian artifacts, especially as many of these amateurs do not appreciate the importance to scholarship of leaving an archaeological site intact and undisturbed until the location of each object in it has been carefully mapped to enable inferences concerning the design, layout, size, and age of the site, and the practices and culture of the inhabitants, to be drawn. It is also unlikely that a Congress sufficiently interested ·in archaeology to impose substantial criminal penalties for the violation of archaeological regulations (the maximum criminal penalty under the Act is five years in prison plus a $100,000 fine, § 470ee(d)) would be so parochial as to confine its interests to archaeological sites and artifacts on federal and Indian lands merely because that is where most of them are.

■ We conclude that section 470ee(c) is not limited to objects removed from federal and Indian lands, but we must consider Gerber's alternative argument, that the section is limited to removals in violation of state and local laws explicitly. concerned with the protection of *archaeological* sites or objects. Gerber argues that if it is not so limited all sorts of anomalies are created. Suppose he had bought an Indian artifact from its rightful owner but had failed to pay the applicable state sales tax, and had transported the artifact across state lines. Then he would, he tells us, be transporting in interstate commerce an archaeological object purchased in violation of state law. And likewise if he transported such an object in interstate commerce in a vehicle that exceeded the weight limitations imposed by state law.

■ These are poor examples. It is unlikely in either case that the state would consider the *transportation* of a good to be in violation of state law merely because sales tax had not been paid or an overweight vehicle had been used. But we agree with the general point, that the Act is limited to cases in which the violation of state law is related to the protection of archaeological sites or objects. A broader interpretation would carry the Act far beyond the objectives of its framers and create pitfalls for the unwary. But we do not think that to be deemed related to the protection of archaeological resources a state or local law must be *limited* to that protection. A law that forbade the theft of Indian artifacts "and any other objects having historical or artistic value" could not reasonably be thought a law unrelated to the protection of such artifacts merely because it had broader objectives. That is essentially what Indiana's laws forbidding trespass and conversion have: objectives that include but are not exhausted in the protection of Indian artifacts and other antiquities. A law that comprehensively protects the owner of land from unauthorized incursions, spoliations, and theft could well be thought to give all the protection to buried antiquities that they need, making the passage of a law specially protecting buried antiquities redundant—and the passage of new laws is never costless and rarely easy. The interpretation urged by Gerber would if accepted compel

states desiring federal assistance in protecting Indian artifacts in nonfederal, non-Indian lands within their borders to pass laws that might duplicate protections already adequate conferred on landowners sitting atop undiscovered archaeological sites by existing laws of general applicability. Granted, all fifty states have laws expressly protecting their archaeological sites; and in 1989, too late for this case, Indiana amended its law to forbid—redundantly—what Gerber had done. So the interpretation for which he contends might not actually impose a significant burden on the states. But Indiana may not have amended its law earlier because it thought its general criminal laws of trespass and conversion adequate—for all we know, it amended the law in response to Gerber's contention that the federal Act contains a loophole through which he and others like him might be able to squeeze.

We conclude that Gerber's conduct was forbidden by the Act. We commend counsel, Harvey Silets for the defendant and Larry Mackey for the government, for the exceptional quality of their briefs and argument. We have not hesitated to criticize counsel who fall below minimum professional standards for lawyers practicing in this court; equally, counsel whose performance exceeds those standards by a generous margin deserve our public recognition and thanks.

AFFIRMED.